UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


PHL Variable Insurance Company,

     Plaintiff,

v.

Bernard Fidel 2007 Irrevocable Trust,
by and through its trustee, BNC
National Bank, Richard W. Smith,
The Producers Group Advantage LLC, and
William Stansbury,

     Defendants.

New Stream Insurance LLC,

     Third Party Plaintiff,

v.

PHL Variable Insurance Company,

     Third Party Defendant.


Richard W. Smith and The Producers
Group Advantage LLC,

     Third Party Plaintiffs,

v.

Bruce Burns and Wholesale Life Insurance
Brokers, Inc.,

     Third Party Defendants.

**MEMORANDUM OF LAW
AND ORDER**
Civil No. 09-629

_____

1

PHL Variable Insurance Company,

     Plaintiff,

v.

Sidney Nachowitz 2007 Irrevocable Trust,           Civil No. 09-1923
by and through its trustee, BNC
National Bank, Richard W. Smith,
The Producers Group Advantage LLC, and
William Stansbury,

     Defendants.

Global Secured Capital Fund, LP,

     Third Party Plaintiff,

v.

PHL Variable Insurance Company,

     Third Party Defendant.

Richard W. Smith and The Producers
Group Advantage LLC,

     Third Party Plaintiffs,

v.

Bruce Burns and Wholesale Life Insurance
Brokers, Inc.,

     Third Party Defendants.

_____

PHL Variable Insurance Company,

     Plaintiff,

v.

Carmella Damato 2007 Irrevocable Trust,       Civil No. 09-1924
by and through its trustee, BNC
National Bank, Richard W. Smith,
The Producers Group Advantage LLC, and
William Stansbury,

     Defendants,

Global Secured Capital Fund, LP,

     Third Party Plaintiff,
v.
PHL Variable Insurance Company,

     Third Party Defendant

Richard W. Smith and The Producers
Group Advantage LLC,

     Third Party Plaintiffs,
v.
Bruce Burns and Wholesale Life Insurance
Brokers, Inc.,

     Third Party Defendants.

_____

     David T. McDowell and Jarrett E. Ganer, Edison, McDowell &
Hetherington, LLP and Stephen P. Lucke and Bryan Keane, Dorsey & Whitney,
LLP, Counsel for Plaintiff and Third Party Defendant PHL Variable Insurance
Company.

     Jeffrey C. Weinstein, Mittenthal Weinstein LLP and Patrick M. Biren,
Brownson & Ballou, PLLP, Counsel for Defendants and Third Party Plaintiffs
Richard W. Smith and The Producers Group Advantage LLC.

John A. Markert, Coleman, Hull and Van Vliet, PLLP and David P.
Schippers, Schippers & Associates, LLP, Counsel for Third Party Defendants
Bruce Burns and Wholesale Life Insurance Brokers.

_____

This matter is before the Court on PHL Variable Insurance Company's

("PHL") motions for summary judgment against Richard W. Smith ("Smith") and

The Producers Group Advantage ("TPGA") (collectively the "Smith

Defendants"); the Smith Defendants' motions for summary judgment against

PHL; and Bruce Burns ("Burns") and Wholesale Life Insurance Brokers, Inc.'s

("WLIB") (collectively the "Burns Defendants") motions for summary judgment

against the Smith Defendants.

## I.    Introduction

These cases involve multi-million dollar life insurance policies that were

issued by PHL based on applications that included gross misrepresentations as to

the applicant's net worth and income.  Prior to the discovery of these

misrepresentations, six figure premiums were paid to PHL, who in turn paid six

figure commissions to the individual producers and sub-producers who

submitted the applications containing fraudulent statements.

This Court previously granted PHL's request that the policies at issue be

rescinded and declared void *ab initio*, and allowed PHL to deposit the premiums

paid into the Court registry.  At issue in the motions before the Court is whether

the individual producers and sub-producers responsible for submitting the

fraudulent applications to PHL must refund any or all of the compensation paid

them when said policies were initially issued.

### A.   Factual Background

TPGA is a general agent that sells life insurance policies for multiple

insurance companies, including PHL.  (Weinstein Declaration Ex. 16 (Smith

Deposition at 10).)  Smith is one of three shareholders in TPGA and is also the

sole shareholder of RWS, through which the commission for the Damato Policy

was paid.  (Id. at 9.)  WLIB is an independent insurance broker that gathers

information from persons seeking life insurance, and then contacts general agents

to see what policies are available and will fit the needs of the proposed client.

(Id. Ex. 15 (Burns Dep. at 101-02).) At the time the policies at issue in this case

were issued, WLIB had six employees.  (Id. at 20.)  Burns is the sole shareholder

of WLIB, but was paid a W-2 wage, and when the company was profitable, Burns

was paid a distribution.  (Markert Decl. Ex. E (Malina Aff. ¶¶ 3-5).)

In the usual course of business, WLIB and TPGA entered into oral

agreements as to how commissions would be split.  (Weinstein Decl. Ex. 16

(Smith Dep. at 26-27, 81, 84 and 85).)  These oral agreements concerned

commission split only - no other terms were addressed, such as when and if

commissions would be returned or refunded.  (Id. at 28, Ex. 15 (Burns Dep. at

85).)  Pursuant to these oral agreements, commission for the Fidel Policy was

paid by TPGA to WLIB on May 11, 2007; the commission for the Damato Policy

was paid by RWS to WLIB on September 20, 2007; and the commission for the

Nachowitz Policy was paid by TPGA to WLIB on February 2, 2008.  (Markert

Decl. Ex. F.)

TPGA's general practice was to receive medical information on proposed

insureds from brokers such as WLIB and then use that information to determine

what insurance carriers would offer based on that person's medical history.  (Id.

Ex. A (Smith Dep. at 16).)  Once TPGA determined the best policy, the financial

information is gathered from the insured, the application is filled out and the

information is submitted to the insurance company.  (Id. 16-17.)  With regard to

the policies at issue, the applications were filled out by WLIB employees. (Id. Ex.

C (Burns Dep. at 73).)  The applications each contain a certification, which reads

"The Producer hereby confirms he/she has truly and accurately recorded on the

application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for." (Weinstein Decl. Exs. 2, 4 and 6.)

After the applications were filled out, they were sent to the proposed insured and the representative of the trust for signature. (Id. Ex. 14 (Burns Dep. at 76).) The proposed insured was also required to verify that the information contained therein are those of the proposed insured and that such statements are full, complete and true to the best of their knowledge. (Id. Exs. 2, 4 and 6.) In addition, WLIB received independent financial statements to support the financial representations of the proposed insured, copies of medical records and an independent inspection report. This information was forwarded to TPGA, then forwarded to PHL. (Id. Ex. 14 (Burns Dep. at 241-42), Ex. 15 (Burns Dep. at 104, 105); Ex. 16 (Smith Dep. at 21-22).) Neither WLIB or TPGA conducted additional verification of the information that was provided by the proposed insured. (Id. Ex. 15 (Burns Dep. at 128-29; Ex. 16 (Smith Dep. at 45).) Smith testified that he did not review the documents, but that his staff did. (Id. Ex. 16 (Smith Dep. at 21-22).)

**B.     Fidel Policy**

On or about March 2, 2007, PHL received the application for life insurance from the Bernard Fidel 2007 Irrevocable Trust ("Fidel Trust") on behalf of Bernard Fidel.  (Ganer Declaration, Ex. 9.)  The Smith Defendants acted as the general agent with respect to the Fidel Policy, and Bruce Burns was the producer of the policy.  (Id. Ex. 10; Smith Aff. ¶¶  2 and 4.)  The application included a statement that Fidel's net worth was $10 million.  (Id. Ex. 9.)  PHL issued a life insurance policy, Policy No.  97521141, to the Fidel Trust effective March 19, 2007, with a total face value of $5 million ("Fidel Policy").  (Id. Ex. 11.)  PHL paid Smith a commission and expense allowance payments totaling $184,285.53 for the issuance of the Fidel Policy.  (Turner Affidavit ¶ 3, Ex. 2.)

It was later determined that the application completed by the Fidel Trust included fraudulent and material misrepresentations.  As a result, the Fidel Policy was ultimately rescinded and declared void *ab initio* by Order of this Court dated June 4, 2010.  (Civil No. 09-629, Doc. No. 62).  Thereafter, PHL tendered to the Court's registry an amount equal to the premiums paid on the Fidel Policy. (Ganer Decl., Ex. 3.)

### C.     Nachowitz Policy

8

On November 28, 2007, PHL received an application for life insurance from the Sidney Nachowitz 2007 Irrevocable Trust ("Nachowitz Trust"), to insure the life of Sidney Nachowitz.  (Ganer Aff. Ex. 17.)  This application provided that Nachowitz's net worth was $46,121,740.  (Id.)   Again, the Smith Defendants acted as the broker general agent with respect to the Nachowitz Trust application, and Burns acted as the producer.  (Id. Ex. 18; Smith Aff. ¶¶ 2 and 4.) PHL ultimately issued a life insurance policy for Nachowitz, effective October 18, 2007 ("Nachowitz Policy"), with a face value of $10 million.  (Id. Ex. 19.)  PHL paid Smith commission and expense allowance payments totaling $357,970.60 for the issuance of the Nachowitz Policy.  (Turner Aff. ¶ 4, Ex. 3.)

As with the Fidel Policy, PHL later determined that the application completed by the Nachowitz Trust included fraudulent and material misrepresentations.  The Nachowitz Policy was ultimately rescinded and declared void *ab initio* by Order of this Court dated February 24, 2010.  (Civil No. 09-1923, Doc. No. 53).  Thereafter, PHL tendered to the Court's registry an amount equal to the premiums paid on the Nachowitz Policy.  (Ganer Decl. Ex. 22.)

D.    **Damato Policy**

On July 20, 2007, PHL received an application for life insurance from the Carmella Damato 2007 Irrevocable Trust ("Damato Trust") to insure the life of Carmella Damato.  (Id. Ex. 25.)  The application noted that Carmella Damato had a net worth of $14,070,800.  (Id.)   This application was also submitted to PHL through the Smith Defendants as broker general agent and Burns as the producer. (Id. Ex. 26; Smith Aff. ¶¶ 2 and 4.)  PHL issued a life insurance policy to Damato, with death benefits of $10 million ("Damato Policy") and paid Smith a commission and expense allowance payments totaling $260,513.11.  (Turner Aff. ¶ 5, Ex. 4.)

Like the previous policies, the Damato application included fraudulent and material misrepresentations, and the Damato Policy was ultimately rescinded and declared void *ab initio* by Order of this Court dated June 4, 2010.  (Civil No. 09-1924, Doc. No. 44).  Thereafter, PHL tendered to the Court's registry an amount equal to the premiums paid on the Damato Policy.  (Ganer Decl., Ex. 30.)

After amending the complaints in the above actions to add a claim of breach of contract against the Smith Defendants, PHL demanded that the Smith Defendants return the compensation he was paid on the above policies, but the Smith Defendants refused to do so.

10

### E.   Contracts between PHL and Smith, TPGA and RWS

On May 24, 2005, Smith, on his own behalf, entered into an Independent

Producer Contract ("IPC") with PHL.  (Turner Aff. Ex. 1.)  On January 1, 2007,

PHL entered into a Brokerage General Agent Agreement with RWS Marketing

Services, LLC ("RWS").  (Id. Ex. 6.)   Then, on August 29, 2007, PHL and TPGA

entered into a Brokerage General Agent Agreement.  (Id. Ex. 5.)  Finally, Smith

entered into a Broker Agreement with PHL on February 25, 2008, which governs

commissions paid to Smith on products sold through RWS.  (Id. Ex. 7 at PHL/D

000935.)  At issue in the cross motions for summary judgment between PHL and

the Smith Defendants is which of the above agreements controls, and whether

that agreement requires the Smith Defendants to repay the compensation paid

them, in the form of commissions and expense allowance payments, for the

above described insurance policies that have been judicially declared rescinded

and void *ab initio*.

### F.   Third Party Complaint

After it was discovered that the Fidel, Nachowitz and Damato applications

contained material misrepresentations and after PHL brought actions against the

respective trusts and the Smith Defendants, the Smith Defendants brought a third

party complaint against the Burns Defendants, alleging breach of implied

contract, unjust enrichment, implied indemnity, promissory estoppel, fraud and

negligence.  The Smith Defendants seek to have Burns and/or WLIB pay back any

commission paid to WLIB in the amount the Smith Defendants may be adjudged

to owe PHL.

## II.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56 (c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  This burden can be met "by 'showing' -

that is, pointing out to the district court - that there is an absence of evidence to

support the nonmoving party's case."  Id. at 325.  The party opposing summary

judgment may not rest upon mere allegations or denials, but must set forth

specific facts showing that there is a genuine issue for trial.  Krenik v. County of

Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## III.   PHL's and the Smith Defendants' Cross Motions for Summary Judgment

A.      **Which Contract Controls**

Under the IPC, Smith was given authority to act as an independent

producer for PHL and to enlist sub-producers.  (Turner Aff., Ex. 1 at PHL/D

000791.)  The IPC allowed Smith to solicit applications for all products offered by

PHL, deliver policies, collect and submit the first premiums and service his

business subject to the terms of the IPC.  (<u>Id.</u>)  The IPC further provided that

Smith would earn commissions on policies and annuities that he or his sub-

producers secured for PHL.  (<u>Id.</u>)  The IPC also provided that Smith would

receive compensation for Expense Allowance Payments ("EAP") incurred in

soliciting and placing insurance or annuity contracts.  (<u>Id.</u> at PHL/D 000803.)

When Smith entered into the IPC with PHL, he was assigned producer

code  306697 by PHL.  (Turner Aff. ¶ 7.)  He was assigned additional producer

codes when he executed the Broker General Agent Agreements on behalf of

TPGA and RWS and the Broker Agreement on behalf of himself (collectively the

"Broker Agreements").  (<u>Id.</u> ¶ 8.)  When compensation was paid, it would be paid

under a specific producer code that reflected the contract under which Smith or

his sub-producer was being compensated.  (<u>Id.</u>)  The record demonstrates that

commissions and EAPs were made to Richard Smith under the producer code

13

306697 for the Fidel, Nachowitz and Damato polices.  (<u>Id.</u> ¶ 9; Exs. 2-4.)

The IPC further provides:

> Should the Company for any reason refund any premium on any policy sold or annuity hereunder, You shall repay on demand any commissions or any other compensation received therein, including, but not limited to, the refund of any premiums under any Free Look Provision.  You shall also refund any advanced commissions or other compensation which became unearned because of non-payment of premiums.

(<u>Id.</u> Ex. 1 at PHL/D 000802.)  With respect to EAPs, the IPC provides:

> In the event the Company makes Expense Allowance Payments to which You are not entitled under the terms of this Contract and Schedule attached hereto, You agree to refund any amounts due the Company promptly upon demand by the Company . . . The terms of this provision shall not be impaired by termination of this Agreement.

(<u>Id.</u> at PHL/D 000803.)

Because the premiums paid on all policies at issue were refunded when such funds were deposited in the Court registry, PHL asserts that Smith is required to refund the compensation he received on said policies pursuant to the terms of the IPC.  Further, as the policies have been judicially rescinded, Smith did not "earn" any compensation for such policies.  It is PHL's position that the Smith has materially breached the IPC by  failing to refund any of the compensation paid him on the policies at issue in these cases.

The Smith Defendants argue that the IPC was superseded and replaced by the Broker Agreements.  The Broker Agreements are nearly identical, and each provides in pertinent part:

> Entire Agreement; Modification.  This Agreement replaces and supersedes all other agreements (written and oral) between [Broker General Agent/Broker] and Phoenix to the extent that any such agreement pertains to the Phoenix Products and services specified in Schedule 3.1 . . .

(Id. at PHL/D 000932.)

After reviewing the terms of the IPC and the various Broker Agreements, the Court finds the Broker Agreements were not intended to supersede the IPC. The Broker General Agent Agreements govern those sales of PHL products made by either RWS or TPGA, and the Broker Agreement is intended to govern those sales by Smith on behalf of RWS.  None of the Broker Agreements, however, provide for the use of sub-producers.

On the other hand, the IPC governs those sales of PHL products by Smith through the involvement of a sub-producer.   Here, the parties do not dispute that with respect to the policies at issue, a sub-producer, Bruce Burns, forwarded the fraudulent applications to Smith.  Finally, the record clearly provides that Smith was paid under the producer code assigned to the IPC.  Based on these

undisputed facts, the Court finds that the terms of the IPC govern whether the

Smith Defendants are contractually obligated to repay compensation paid on the

above policies. Pursuant to the IPC, Smith "must repay on demand any

commissions or any other compensation received therein" and must refund any

EAPs paid "to which [Smith] is not entitled under the terms of this Contract and

Schedule attached hereto."  (Id. Ex. 1 at PHL/D000802-803.)[1]

### B.      Whether PHL Refunded the Premiums

The Smith Defendants argue that the premiums paid on the Nachowitz,

Fidel and Damato policies were ultimately divided between PHL and Global

Secured Capital Fund, LP ("Global") and New Stream Insurance LLC ("New

Stream") pursuant to the settlement between those parties.  The Smith

Defendants thus argue that PHL cannot be said to have refunded the premiums.

As a result, no provision of the Broker Agreements or the IPC has been triggered

requiring the Smith Defendants to return the compensation received on the above

---

[1]Even if the Broker Agreements controlled, those agreements provide that compensation shall be paid "on payments received by Phoenix for contracts which are produced in accordance with this Agreement and which are delivered to the proposed contract owner."  (Turner Aff. Ex. 5 at PHL/D 000905; Ex. 6 at PHL/D 001102; Ex. 7 at PHL/D 00924.)  The policies at issue have been voided *ab initio*, and the premiums refunded, therefore there is no basis upon which the Smith Defendants can assert that they are entitled to retain any payments on a policy that - by operation of law - never came into existence.

policies.

The Court finds that this argument has no merit.  There can be no dispute that PHL initially placed the entire premiums received on the above policies into the Court's registry.  At the time the monies were so deposited, many claims were asserted against the premiums and no determination had been made on those claims.  The fact that a settlement occurred at a later time does not alter the fact that PHL did, in fact, refund the premiums.

### C.    The Smith Defendants' Affirmative Defenses

The Smith Defendants assert that summary judgment in favor of PHL is not appropriate as there are genuine issues of material fact as to whether PHL acted reasonably and in good faith, and whether PHL failed to mitigate its damages or caused its own damages.  Whether PHL was reasonable in entering into the settlement agreements is a question of law for the court.  Osgood v. Medical, Inc., 415 N.W.2d 896, 903 (Minn. Ct. App. 1987).

The Smith Defendants argue that PHL caused its own damages by entering into settlement agreements with Global and New Stream.  They argue that given the fraudulent statements contained in the policy applications, it was clear that PHL had the right to retain all of the premiums paid, as set forth in PHL Variable

Ins. Co. v. Lucille Morello 2007 Irrevocable Trust, 645 F.3d 965 (8th Cir. 2011).

Thus, PHL's agreement to return a portion of the premiums to Global and New

Stream was unreasonable and done in bad faith.  The Court disagrees.

At the time PHL entered into settlement agreements with Global and New

Stream, the Morello decision was on appeal.  Thus, the settlements were entered

into before PHL knew it would be successful on appeal.  In addition, PHL asserts

that it did not know if Global or New Stream would assert new or different

claims in these actions that would not be addressed in the Morello decision.

Based on these facts and circumstances, the Court cannot find that it was

unreasonable for PHL to enter into settlement agreements with Global and New

Stream.

Finally, the Smith Defendants argue in opposition to PHL's motion that

there are genuine issues of material fact precluding summary judgment in favor

of PHL as to whether PHL acted reasonably and in good faith when it issued the

above policies.  The Smith Defendants argue that PHL's underwriting

department failed to discover any of the material misrepresentations made in the

policy applications at issue in these cases.  Had the underwriting department

conducted due diligence as to the information contained in the policy

18

applications, these disputes would not have arisen.

No evidence has been presented to the Court concerning the actions or inactions of PHL's underwriting department with respect to the above policies. To properly oppose summary judgment, however, the Smith Defendants "may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial." Krenik, 47 F.3d at 957. Accordingly, the Court finds that the Smith Defendants have failed to demonstrate a fact question as to whether PHL acted reasonably or in good faith with respect to its review of the policy applications at issue.

### D.    Offset

The Smith Defendants argue that in the event summary judgment is entered in favor of PHL, the Court should determine that any monetary award to PHL be offset by other monies due Smith, but withheld by PHL.

On or about January 31, 2008, PHL charged back $984,025 from Smith related to policies not at issue here.  (Turner Aff. ¶ 10.)  PHL also charged back $538,714 from Smith related to another policy not at issue here.  (Id.)  Smith asserts that chargebacks are allowable only on the condition that PHL returned or refunded premiums.  There is no evidence in the record to show that PHL

refunded or returned premiums on those policies referenced in paragraph 10 of the Turner Affidavit as of January 31, 2008.  In fact, the record shows that the Nachowitz, Fidel and Damato policies were rescinded prior to those policies referenced in paragraph 10.  From this evidence, Smith asserts that the chargebacks referred to in paragraph 10 must be applied to the instant cases, rather than the referenced policies.

The Court finds that because the above referenced chargebacks concern policies not at issue in this litigation, such chargebacks are irrelevant and do not provide an offset in this case.

### E.     Conclusion

Based on the above, the Court finds that PHL has demonstrated that pursuant to the IPC, Smith was required to repay to PHL any commissions or any other compensation received in the event PHL refunds a premium.  PHL has further demonstrated that it refunded the premiums with respect to the above policies, and that Smith has not repaid the commissions and other compensation he received with respect to such premiums.  Accordingly, PHL is entitled to summary judgment against the Smith Defendants as to Count II of the First Amended Complaints in the above-referenced actions.

20

## IV.    The Burns Defendants' Motion for Summary Judgment

### A.    Whether Burns Can Be Held Personally Liable

#### 1.    Piercing the Corporate Veil.

Burns argues that although he is the sole shareholder of WLIB, at all times relevant herein, he was acting as an employee of WLIB.  Thus, he is entitled to the protections afforded him as an employee - namely that he cannot be held personally liable for any of the claims included in the Third Party Complaint. With regard to cases venued in Minnesota, the determination of shareholder liability is measured by the law of the state where the company is incorporated - in this case Illinois.  <u>Furst v. Beygeh</u>, 192 Minn. 454, 458, 257 N.W. 79, 81 (Minn. 1934).

The Smith Defendants argue that with respect to the policies at issue, Burns was acting on his own behalf - not as an employee, officer or director of WLIB.  For example, they argue that the agreements to split commissions on the policies at issue were between Smith and Burns, not TPGA or WLIB.  (Weinstein Decl., Ex. 16 (Smith Dep. at 27).)  Also, Burns listed his personal social security number on the policy application documents.  (<u>Id.</u>, Exs. 2-7.)  The IPC between PHL and Smith requires that "all applications for the products offered under this

contract shall be solicited only by *individuals* (hereinafter "Sub-producers")

representing You who have been duly licensed under the applicable insurance

laws to secure such applications and who indicate on each such application that

it has been solicited on Your behalf."  (Id., Ex. 1, p. 8.) (emphasis added).  Further,

the Smith Defendants assert that Burns, in his individual capacity, was licensed

to sell insurance products in Minnesota, while WLIB was not.  (Id. Exs. 11-13.)

As demonstrated above, however, the commission payments for the

policies at issue were made payable to WLIB.  (Markert Decl. Ex. F.)  The fact that

Burns is the "person" at WLIB that is licensed to sell insurance in Minnesota, on

behalf of WLIB, has no bearing on whether he was acting in his personal

capacity, or as an employee.  Minnesota law allows an individually licensed

producer to write insurance and earn a commission on behalf of a company.

Minn. Stat.  § 60K.48, subd. 3(b).  Accordingly, personally liability will not be

imposed on Burns on the basis that he was acting as an individual, apart from

WLIB.

Under Illinois law, there is a presumption that a corporation is "separate

and distinct from its officers and directors, and those parties will not be held

personally liable for the corporation's debts and obligations."  Judson Atkinson

Candies, Inc. v. Latini-Hohberger Dhimantec, 529 F.3d 371 (7th Cir. 2008)

(quoting Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc., 864 N.E.2d

927, 941 (Ill. App. Ct. 2007)).   In order to pierce the corporate veil, Illinois courts

apply a two prong test: "(1) there must be such unity of interest and ownership

that the separate personalities of the corporation and the individual or other

corporation no longer exist; and (2) circumstances must be that such an

adherence to the fiction of separate corporate existence would sanction a fraud or

promote injustice."   Dimmitt & Owens Fin., Inc. v. Superior Sports Prod., Inc.,

196 F. Supp. 2d 731, 738 (N.D. Ill. 2002).

The Court can consider the following factors in determining whether there

is a sufficient "unity of interest" to justify disregarding the corporate form:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe
> corporate formalities; (4) nonpayment of dividends; (5) insolvency of the
> debtor corporation; (6) nonfunctioning of the other officers or directors; (7)
> absence of corporate records; (8) commingling of funds; (9) diversion of
> assets from the corporation by or to a shareholder; (10) failure to maintain
> arm's length relationships among related entities; and (11) whether the
> corporation is a mere facade for the operation of the dominant
> shareholders. . . . Significantly, no single factor is determinative in deciding
> whether to disregard a corporate entity.

Id, 196 F. Supp.2d at 738 (citations omitted).

The Burns Defendants argue no evidence has been produced to justify

disregarding the corporate form of WLIB.  The undisputed facts show that WLIB was incorporated in 1998, it had employees in addition to Burns, WLIB has filed corporate tax returns and there is no commingling of Burns' personal funds with those of the corporation.  (Malina Aff. ¶¶ 2-5.)  When paid by the Smith Defendants for the policies at issue, the checks were made payable to WLIB. (Markert Decl., Ex. F.)  The Smith Defendants argue that the corporate veil should be pierced because WLIB is no longer in business, Burns is the only shareholder and there is no record that WLIB held regular corporate meetings.

The Court finds that the evidence before it does not create a genuine issue of material fact that the corporate form should be disregarded in this case.  It is not enough to show that Burns is the only shareholder, and that he did not conduct corporate meetings.  Instead, there must be evidence that Burns "disregarded [WLIB's] corporate entity, such as by intermixing its finances with his own or using it as a thinly capitalized sham to avoid liability . . ." Melko v. Dionisio, 580 N.E.2d 586, 595 (Ill. 1991).  The Smith Defendants have presented no such evidence.

**2..     Whether Burns Engaged in Wrongdoing.**

An exception to the general rule that an officer of a corporation cannot be held liable for the debts of the corporation exists when the officer is alleged to have taken part in the illegal act that gave rise to the corporate liability. Musikiwamba v. ESSI, Inc., 760 F.2d 740, 753 (7th Cir. 1985).  The Smith Defendants assert there are disputed material facts as to whether Burns participated in the alleged preparation of the fraudulent policy applications that are at issue.

The Smith Defendants assert that each of the applications at issue include material misrepresentations as to the net worth and income of the applicant. Further, these applications each include a statement that the producer "confirms that he or she has truly and accurately recorded on the application the information supplied by the proposed insured and that he or she is qualified and authorized to discuss the contract herein applied for." (Weinstein Decl. Exs. 2, 4 and 6.)  Burns testified, however, that he did not record any of the information on the applications and that he permitted his signature to be stamped on the Nachowitz application before it was completed or signed by Nachowitz.  (Id., Ex. 15 (Burns Dep. at 100, 104-05); Ex. 14 (Burns Dep. at 140, 159, 204).)  Burns also authorized the drafting and stamping of his signature on a cover letter with

respect to the Nachowitz application, in which he falsely states that Nachowitz

had been his client for over a year, and falsely represented Nachowitz's

employment and business history, and states that Nachowitz's net worth of $46

million.  (Id. Ex. 14 (Burns Dep. at 101-05); Ex. 19.)  Burns also testified that

although applicants are supposed to sign the application in the presence of a

witness, WLIB implemented a policy to witness the insured's signature outside of

their presence, based on a photocopy of their driver's license.  (Id. Ex. 15 (Burns

Dep. at 98).)

The Smith Defendants further assert that Burns entered into a relationship

with Jason Mitan and an entity known as Cambridge Management, under which

WLIB would pay it referral fees for clients referred to WLIB.  (Weinstein Decl.,

Ex. 15 (Burns Dep. at 46 and 129-30).)  Such referral fees were paid on the

Nachowitz and the Damato Policies.  (Id., Ex. 14 (Burns Dep. at 48); Ex. 15 (Burns

Dep. at 129-30).)  The payment of such referral fees, however, was contrary to the

Producer Report which provides: "I agree that no person other than the

undersigned shall profit by any commission on insurance issued on this

application.  Commission will be paid as described according to the contracts on

filed in the home office."  (Id. Exs. 3, 5, and 7.)  The Smith Defendants argue that

the applications at issue were all prepared in a similar manner, and although

Burns denies wrongdoing, the pattern of fraud and the processes Burns engaged

in to complete, witness and submit the applications demonstrates that he did, in

fact, participate in the fraud.

The Burns Defendants respond that while the Smith Defendants point to

certain alleged violations of protocol when the applications were completed,

none of these alleged violations were illegal.  Further, PHL's Chief Underwriter

testified that it was not necessary that the producer obtain information on the

application directly from the proposed insured; it would be understood that this

information could come from tax attorney's or financial planners or other such

professionals.  (Weinstein Decl., Ex. 42 at 125-26.)  This underwriter also testified

that there is no requirement that the producer independently verify the financial

condition of the applicant.  (Id. at 119-20.)

The Court finds that the Smith Defendants have not demonstrated that

genuine issues of material fact exist as to whether Burns knowingly participated

in a scheme to present applications for multi-million dollar life insurance policies

that included materially false statements.  Specifically, the Smith Defendants

point to no evidence that the Burns Defendants knew or should have known that

the information provided in the applications were not accurate.  In addition, no

evidence has been presented from which the fact finder could reasonably infer

the Burns Defendants knew or should have known of the fraud.  Accordingly, the

Court finds no basis upon which to find Burns individually liable.

**B.      Breach of Implied Contract**

The Burns Defendants assert that under either Minnesota, Florida or

Illinois law, a claim for breach of implied contract cannot lie where there is an

express contract.  See Kovtan v. Frederiksen, 449 So.2d 1 (Fla. Dist. Ct. App.

1984); Barry Mogul & Assoc., Inc. v. Terrestris Dev. Co., 643 N.E.2d 245, 251 (Ill.

Ct. App. 1994); Schimmelpfennig v. Gaedke, 27 N.W.2d 416, 420 (Minn. 1947).

There is no dispute that the parties had an oral agreement as to how commissions

would be split among them, and that there was no agreement concerning the

repayment or refund of commissions paid.  The Burns Defendants assert that

because there is no express agreement as to the repayment or refund of

commissions, the Smith Defendants assumed the business risk of having to repay

commissions to PHL on the policies at issue without any contribution from the

Burns Defendants.

Acknowledging that the record includes evidence of an express agreement

concerning commission splitting, the Smith Defendants move the Court to amend

their complaint to assert a claim of breach of express contract.   The Federal Rules

of Civil Procedure provide that the Court should freely grant leave to amend a

complaint when justice so requires.  Fed. R. Civ. P. 15 (a)(2).  Here, the Smith

Defendants assert that the Burns Defendants have impliedly consented to such an

amendment, by raising the existence of this express contract in their motion for

summary judgment.  The Burns Defendants acknowledge that Rule 15 (a)(2) must

be liberally construed, but argue the motion to amend should be denied where

such amendment would be futile.

Pursuant to Illinois law, when interpreting a contract, the Court must first

determine the threshold inquiry is whether the contract is ambiguous.  <u>Bourke v.</u>

<u>Dun & Bradstreet Corp.</u>, 159 F.3d 1032, 1036 (7th Cir. 1998).  "In Illinois, '[a]n

instrument is ambiguous only if the language used is reasonably or fairly

susceptible to having more than one meaning, but it is not ambiguous if a court

can discover its meaning simply through knowledge of those facts which give it

meaning as gleaned from the general language of the contract. A contract is not

rendered ambiguous simply because the parties do not agree on the meaning of

its terms.'"  <u>Id.</u>  Where an ambiguity exists, the Court can "look to extrinsic

evidence to clear up a contract's ambiguity." <u>Markin v. Chebemma Inc.</u>, 526 F. Supp. 2d 890, 896 (N.D. Ill. 2007).

Here, the parties do not dispute that their commission split agreements were oral agreements, and that the commission split was negotiated for each policy placed. The parties also agree that they did not specifically address whether commissions would be repaid if a policy was rescinded and the premiums refunded by the insurer. Silence as to a particular aspect of the parties' agreement may render such an agreement ambiguous. <u>Rossetto v. Pabst Brewing Co., Inc.</u>, 217 F.3d 539, 546 (7th Cir. 2000) (applying Illinois law). The same is true under Minnesota and Florida law. <u>See</u>, <u>e.g.</u>, <u>QFS, Inc. v. Juno Enterprises, Inc.</u>, 1995 WL 238935, at *1 (Minn. Ct. App. Apr. 25, 2995) (agreement was ambiguous because it was silent on whether commissions would be paid in a certain circumstance); <u>Sullivan v. Sullivan</u>, 2002 WL 1467533, at *3 (Minn. Ct. App. July 9, 2002) (citing <u>Columbia Heights Motors, Inc. v. Allstate Ins. Co.</u>, 275 N.W.2d 32, 34 (Minn. 1979)) (parol evidence can be used to determine parties' intent; <u>Hunt v. First Nat. Bank of Tampa</u>, 381 So.2d 1194, 1197 (Fla. Ct. App. 1980) (finding that where a contract fails to address the rights or duties of the parties under certain conditions, such failure results in a latent ambiguity, and the court may

look to extrinsic evidence to determine the parties' intent).  The Court finds that

based on the record before it, the agreement of the parties is ambiguous as to

their rights and duties in the event a policy is rescinded and the premium

refunded.

As noted above, the laws of Illinois, Minnesota and Florida provide that

where a contract term is ambiguous, the court may look to extrinsic evidence to

determine the parties' intent with respect to such term.  At his deposition,

Richard Smith testified that insurance agents "know[] that when a case is done,

there's a chance something could go wrong.  A million things could go wrong. . .

. If a policy gets rescinded, if a client returns a policy for whatever reason and the

carrier refunds the premiums, there is going to be a charge-back and everybody

involved in the commission has to pay back."  (Weinstein Decl., Ex. 16 (Smith

Dep. at 27).)   Also, at his deposition, Burns admitted that if a policy was not

placed, the commission would not be earned, and he would not get paid.  (Id.

Decl., Ex. 15 (Burns Dep. at 72-73).)  Based on this evidence, the Court finds there

are genuine issues of material fact as to whether the parties intended that if the

policy that generated a commission was rescinded and the premiums refunded,

such commission would be refunded.  Accordingly, the Court will allow the

Smith Defendants to amend their complaint to add a claim of breach of contract, and allow such claim to proceed.  Summary judgment as to the claim for breach of implied contract will be granted, as no such claim can be asserted where there is an express contract.

### C.    Unjust Enrichment

The Burns Defendants assert that because there is an express contract, the claim for unjust enrichment fails.  The law of Minnesota, Illinois and Florida is consistent, and supports this position.  In Illinois, "unjust enrichment" is not an independent cause of action.  Pirelli Armstrong Tire Corp. v. Walgreen, 631 F.3d 436, 447 (7th Cir. 2011).  Both Minnesota and Florida provide that a claim for unjust enrichment cannot stand where there is an express contract.  Zarrella v. Pac. Life Ins. Co., 755 F.Supp.2d 1218, 1227 (S.D. Fla. 2010); Sharp v. Laubersheimer, 347 N.W.2d 268, 271 (Minn. 1984).  Based on the settled law on this issue, the unjust enrichment claim must be dismissed.

### D.    Promissory Estoppel

With respect to the claim of promissory estoppel, the laws of Minnesota, Florida and Illinois require evidence of a promise, that the promisor intended reliance on the promise and that the promise must be enforced to prevent an

injustice.  See Olson v. Synergistic Techs. Bus. Sys., Inc. 628 N.W.2d 142, 152

(Minn. 2001); Advanced Mktg. Sys. Corp. v. ZK Yacht Sales, 830 So. 2d 924, 927

(Fla. App. 4 Dist. 2002); Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 906

N.E.2d 520, 523 (Ill. 2009).

The Smith Defendants assert that the confirmations in the applications for

life insurance, whereby the producer "confirms that he/she has truly and

accurately recorded on the application the information supplied by the proposed

insured and that he/she is qualified and authorized to discuss the contract herein

applied for" can be construed as a promise by Burns as to the completeness and

accuracy of the statements contained in the application.  The Court disagrees.

Any statement or confirmation contained within the insurance applications

cannot be construed as a promise to the Smith Defendants; rather the

applications were for the benefit of PHL and submitted to PHL.  Further, the

language of the confirmation provides that the licensed producer was confirming

only that he accurately recorded the information provided by the proposed

insured, not that he verified the information.   Accordingly, the Smith

Defendants' claim of promissory estoppel must be dismissed.

### E.    Fraud

A claim for fraud has the following elements: "(1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party." Lance v. Ward, 457 So.2d 1008, 1011 (Fla. 1984). See also, Flynn v. Am. Home Prods. Corp., 627 N.W.2d 342, 349 (Minn. Ct. App. 2001); Razdan v. Gen. Motors Corp., 979 F. Supp. 755, 759 (N.D. Ill. 1997).

In support of their fraud claim, the Smith Defendants argue that Burns falsely verified that he accurately recorded information on the policy applications at issue, and that the information recorded was false. Burns also provided false information regarding his relationship with Nachowitz, and Nachowitz's business career and net worth. For example, the Nachowitz application was accompanied by a cover letter signed by Burns, in which he stated that Sidney Nachowitz had been his client for approximately one year. (Weinstein Decl. Ex. 19.) At his deposition, however, Burns admitted that Nachowitz was not a personal client of his, rather he was a client of Cambridge. (Id. Ex. 14 (Burns

Dep. at 102).)  He further testified that he had no personal knowledge of

Nachowitz's financial information.  (Id. (Burns Dep. at 108).)   The Smith

Defendants further argue that under the totality of the evidence,  Burns was

involved in procuring a number of large life insurance policies based on false

representations, and that from such evidence, there is a fact question as to

whether Burns did in fact materially participate in a fraud.

To succeed on a fraud claim, however, there must be evidence that the

Burns Defendants knew or should have known that the information provided on

the applications for insurance at issue here was false.  The Court finds that no

evidence has been submitted that to show that Bruce Burns or any other person

at WLIB knew, or should have known, that the financial information included on

the policy applications for Damato, Nachowitz and Fidel was false at the time the

applications were filled out and submitted to PHL.  The same is true with respect

to the cover letter.  There is no evidence that Burns or another WLIB employee

was aware that the information in the cover letter included false information.

Finally, the Smith Defendants cannot base their claim of fraud on the

confirmation statement included in the application, because that confirmation

only required a certification that information was accurately recorded - not that

the information was accurate.

### G.   Negligence

The elements of a negligence claim are a duty of care, breach of that duty, damages, and that the breach was the proximate cause of such damages. Anderson v. State, Dep't of Nat. Res., 693 N.W.2d 181, 186 n.1 (Minn. 2005); Blue v. Envtl. Eng'g, Inc., 803 N.E.2d 187, 194 (Ill. App. 1 Dist. 2003); R.J. Reynolds Tobacco Co. v. Brown, 70 So.3d 707, 717 (Fla. App. 4 Dist. 2011).  Whether a duty exists is a question of law.  Presbrey v. James, 781 N.W.2d 13, 17 (Minn. Ct. App. 2010); Castro v. Brown's Chicken and Pasta, Inc., 732 N.E.2d 37, 42 (Ill. App. 1 Dist. 2000); Jenkins v. W.L. Roberts, Inc., 851 So.2d 781, 783 (Fla. Dist. Ct. App. 2003).

The Smith Defendants assert their negligence claim is based on the duty to verify the information provided by a proposed insured, and that this duty is encompassed by a claim of negligent procurement of insurance.  To prove such a claim requires proof that "(1) that the agent owed a duty to the insured to exercise reasonable skill, care, and diligence in procuring insurance; (2) a breach of that duty; and (3) a loss sustained by the insured that was caused by the agent's breach of duty."  Graff v. Robert M. Swendra Agency, Inc., 800 N.W.2d

36

112, 116 (Minn. 2011).  See also Busey Truck Equip., Inc. v. Am. Family Mut. Ins. Co., 299 S.W.3d 735, 738 (Mo. Ct. App. 2009); Willis Ins. Agency, Inc. v. Luckey, 466 So.2d 1197 (Fla App. 3 Dist. 1985).   As is clear from the elements of such a claim, the duty is owed to the insured, not between insurance agents.  In addition, the claim requires that the breach of duty caused the failure to provide agreed upon insurance.  Here, there is no claim that appropriate insurance was not issued.  Accordingly, to the extent that the Smith Defendants assert a claim of negligent procurement of insurance, such claim has no merit.

There is no authority establishing a duty, between a general agent and a broker, to verify information supplied by an insured.  See, e.g., Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 1994 WL 710771, at *11 (N.D. Ill. Dec. 16, 1994) (finding under Illinois law, duty of insured to provide accurate information to insurer does not extend to insured's broker).  In fact, an insurer is entitled to rely on the statements of the insured.  See Shaughnessy v. New York Life Ins. Co., 203 N.W. 600 (Minn. 1925); Fretwell v. Kansas City Life Ins. Co., 643 F. Supp. 2d 1317, 1323 (N.D. Fla. 2009); Royal Neighbors of Am. v. Boman, 52 N.E.2d 264, 266 (1898).  Based on the above, the Court finds that the Smith Defendants claim of negligence must be dismissed.

### D.    Implied Indemnity

A claim for implied indemnity requires a finding that the Burns Defendants were negligent in its actions relating to the insurance application process, and that the negligence caused the Smith Defendants to incur damages. See O'Connell v. Jackson, 140 N.W.2d 65, 69 (1966); Dade Cty Sch. Bd. v. Radio Station WQBA, 731 So.2d 638, 642 (Fla. 1999); Bristow v. Griffitts Constr. Co., 488 N.E.2d 332, 336 (1986).  Because the Court has found that the negligence claim is without merit, summary judgment as to this claim will be appropriate as well.

### E.    Conclusion

Based on the above, the Court finds that the record supports a claim for breach of contract, and will thus allow the Smith Defendants to amend their complaint to assert such a claim.  Genuine issues of material fact, however, exist as to terms of this express contract and whether there has been a material breach. The Burns Defendants are entitled to summary judgment as to the remaining claims in the Third Party Complaint.

**IT IS HEREBY ORDERED:**

1.    PHL's Motion for Summary Judgment Against Richard Smith [Civil No. 09-629 (Doc. No. 152); Civil No. 09-1923 (Doc. No. 195); Civil No.

1924 (Doc. No. 131)] is GRANTED;

2.      The Smith Defendants' Motion for Summary Judgment Against PHL

        [Civil No. 09-629 (Doc. No. 160); Civil No. 09-1923 (Doc. No. 201);

        Civil No. 1924 (Doc. No. 139)] is DENIED; and

3.      The Burns Defendants' Motion for Summary Judgment Against the

        Smith Defendants [Civil No. 09-629 (Doc. No. 162); Civil No. 09-1923

        (Doc. No. 208); Civil No. 1924 (Doc. No. 146)] is GRANTED in part

        and DENIED in part.  Count I is hereby amended to assert a claim

        for breach of express contract.  The remaining counts in the Third

        Party Complaint are hereby dismissed.

Date:   June 22, 2012

                        s/ Michael J. Davis
                        Michael J. Davis
                        Chief Judge
                        United States District Court